# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE OM GROUP, INC.        :        **CONSOLIDATED**
STOCKHOLDERS LITIGATION   :        **C.A. No. 11216-VCS**

## MEMORANDUM OPINION

Date Submitted:  July 14, 2016
Date Decided:  October 12, 2016

Michael J. Barry, Esquire and David M. Haendler, Esquire of GRANT & EISENHOFER P.A., Wilmington, Delaware; Joel Friedlander, Esquire, Jeffrey M. Gorris, Esquire, and Benjamin P. Chapple, Esquire of FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Mark Lebovitch, Esquire, Jeroen van Kwawegen, Esquire, and Alla Zayenchik, Esquire of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; and Randall J. Baron, Esquire, David T. Wissbroecker, Esquire, Edward M. Gergosian, Esquire of ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California, Attorneys for Plaintiffs.

S. Mark Hurd, Esquire and Thomas P. Will, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, and Robert S. Faxon, Esquire and Adrienne Ferraro Mueller, Esquire of JONES DAY LLP, Cleveland, Ohio, Attorneys for Defendants Joseph Scaminace, Richard W. Blackburn, Steven J. Demetriou, Katharine L. Plourde, Patrick S. Mullin, Hans-Georg Betz, Carl R. Christenson, and John A. McFarland.

**SLIGHTS, Vice Chancellor**

With the benefit of discovery taken in support of an ultimately-abandoned motion to enjoin an arms-length merger, Plaintiffs, former stockholders of non-party, OM Group, Inc. ("OM" or "the Company"), filed their Consolidated Amended Verified Class Action Complaint ("the Complaint") against the former members of the OM board of directors (the "OM Board") seeking declarations that the individual defendants breached their fiduciary duties by entering into the merger and an award of post-closing "recissionary damages." Claims of aiding and abetting a breach of fiduciary duty against the other party to the merger, Apollo Global Management, LLC ("Apollo"), and its affiliates have been voluntarily dismissed.

The Complaint sets forth a disquieting narrative. In the face of a threat of shareholder activism, it is alleged that the OM Board rushed to sell OM on the cheap in order to avoid the embarrassment and aggravation of a prolonged proxy fight. According to Plaintiffs, OM's financial advisors had opined that separate sales of OM's many diverse business units would yield maximum value for OM shareholders. Ignoring this guidance, the OM Board decided to wrap the units for sale in one package to ensure there was nothing left for them to manage, and then hurried the pre-signing sale process and post-signing market check in a manner that ensured strategic buyers would have no time or desire to pursue piecemeal transactions. The OM Board's rush to the closing table, according to Plaintiffs,

1

was unreasonable and in violation of the OM Board's fiduciary duties when reviewed under enhanced *Revlon* scrutiny.

The Complaint alleges that the process undertaken by the OM Board leading up to the transaction with Apollo fell beneath any measure of reasonableness in three particular respects. First, the OM Board deliberately shut out strategic acquirors from the process in favor of a quick deal with a financial sponsor because it knew that strategic acquirors would be more interested in acquiring individual OM business units rather than the entire company. This tunnel vision was fueled by a desire to avoid a public confrontation with a vocal dissident shareholder by selling OM before the dissident could mount a proxy fight. Second, the OM Board failed to manage conflicts among its contingently compensated investment bankers, especially with respect to Deutsche Bank which had received significant fees from Apollo over the three years leading up to the merger. Finally, the OM Board relied upon, and allowed the bankers to rely upon, manipulated projections that understated OM's prospects in order to drive the bankers to conclude that a less-than-reasonable merger price was fair.

OM's stockholders voted overwhelmingly to approve the merger. Nevertheless, Plaintiffs allege that the vote should be disregarded because it was the product of OM's incomplete and misleading public disclosures to stockholders regarding a director conflict, the extent to which the OM Board appreciated and

2

managed the banker conflicts and material details of an indication of interest received by the OM Board during the post-signing go-shop.

Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) on three grounds. First, they contend the Complaint fails to plead facts that would allow a reasonable inference that the OM Board acted unreasonably under *Revlon*. Second, they contend that the fully informed, uncoerced vote of a majority of disinterested stockholders in favor of the merger triggers the irrebuttable business judgment rule. In this regard, they argue that Plaintiffs have failed to identify any material omissions or misleading disclosures in any of the public filings related to the merger. Finally, Defendants argue that even if the stockholder vote did not effectively cleanse any breaches of fiduciary of duty, Plaintiffs have failed to plead either a breach of the duty of loyalty or bad faith such that they can overcome the exculpation clause within OM's certificate of incorporation.

For reasons explained more fully below, even accepting all of its allegations as true, I conclude that the Complaint must be dismissed because a majority of the fully informed, uncoerced, disinterested stockholders voted to approve the merger and Plaintiffs have not alleged that the transaction amounted to waste. Having reached this conclusion, I need not and have not considered whether Plaintiffs have

pled a viable breach of fiduciary duty claim under *Revlon* or whether any such claim would be subject to dismissal under 8 *Del. C.* § 102(b)(7).

## I. BACKGROUND

The facts are drawn from allegations in the Complaint, documents integral to the Complaint and matters of which the Court may take judicial notice.[1]

### A. The Parties

Lead Plaintiffs City of Plantation Police Officers' Retirement System, City of Sarasota Firefighters' Pension Fund, Cruiser Capital Advisors, LLC, Laborers' Local #231 Pension Fund and Northern California Pipe Trades Pension Plan were stockholders of OM at the time of the merger. OM was a Delaware corporation operating as a global chemical and technology conglomerate comprised of five distinct business units: electronic chemicals, photomasks, magnetic technologies, battery technologies and advanced organics.

---

[1] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *8 (Del. Ch. Oct. 24, 2014) ("'A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents.' Under at least the first exception, [the court finds] that consideration of the Proxy Statement is appropriate in resolving this dispute.") (citation omitted); *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014) (on a motion to dismiss, the Court may rely on documents extraneous to a complaint "when the document, or a portion thereof, is an adjudicative fact subject to judicial notice.") (footnotes and internal quotation marks omitted); *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *5 (Del. Ch. Dec. 22, 2010) (same).

Defendants Joseph Scaminace, Steven J. Demetriou, Hans-Georg Betz, Richard W. Blackburn, Carl R. Christenson, John A. McFarland, Patrick S. Mullin and Katharine L. Plourde comprised the OM Board. Scaminace served as OM's CEO starting in June 2005 and as Chairman of the OM Board starting in August 2005. Demetriou served as CEO and Chairman of the board of directors of Aleris Corp. ("Aleris"), a company majority-owned by an investment group that includes affiliates of Apollo. The Complaint named several additional defendants that Plaintiffs have now voluntarily dismissed without prejudice: Joseph M. Gingo, Allen A. Spizzo, Apollo, Platform Specialty Products Corporation ("Platform") and certain Apollo and Platform affiliates.[2]

Apollo, a Delaware limited liability company, along with its subsidiaries, owns and manages the funds and entities that own OM's merger partners, Duke Acquisition Holdings, LLC and Duke Acquisition, Inc. Platform, a Delaware corporation headquartered in Florida, is a diversified producer of high technology specialty chemical products. Platform joined with Apollo to acquire OM.

---

[2] Spizzo and Gingo were to be included in OM's 2015 slate of OM Board nominees pursuant to a Settlement Agreement (defined below) between OM and activist investor, FrontFour Capital Group LLC ("FrontFour"). On March 9, 2016, the Court entered a stipulated dismissal without prejudice as to all claims against Spizzo and Gingo. Plaintiffs initially alleged aiding and abetting claims against Apollo, Platform and their respective affiliates, but filed a notice of voluntary dismissal without prejudice as to those parties and claims on April 27, 2016.

### B. OM's Financial Struggles Prior to the Merger

From 2005 to 2015, OM engaged in a growth strategy favoring acquisitions. OM spent over $1.5 billion in pursuit of this strategy but, by January 2015, the Company's enterprise value was only $750 million. As a result, OM's return on investment severely lagged behind its self-identified peer group. OM's stock traded at $36.76 per share in January 2014; by June 2015, it had fallen to $26.54.

Analyst reports indicated that OM's underperformance was due in large part to operational mishandling attributable to management, including failure to optimize costs and manage working capital. For example, KeyBank Capital Markets reported that OM's Selling, General & Administrative Expense ratio to sales was 21%, as compared to the average peer group ratio of 14%, and that OM's "working capital as a percentage of sales far exceeded that of the Company's peer group."[3]

### C. FrontFour Seeks Operational and Managerial Improvements

In 2013, FrontFour, an activist investor holding approximately 5.8% of OM's outstanding stock, began to communicate with OM's management regarding the Company's lackluster performance. On January 9, 2015, FrontFour issued a public letter to the OM Board and Scaminace "expressing serious concerns with the Company's performance and destruction of stockholder value," and proposing

---

[3] Consolidated Am. Verified Class Action Compl. ("Compl.") ¶ 35.

an operational overhaul that would double OM's stock price by the end of 2016.[4]

A feature of FrontFour's campaign to provide a "fresh perspective"[5] for OM was to highlight the disconnect between executive compensation and company performance.[6] According to FrontFour, even in the midst of OM's value-destructive acquisition strategy and failure to meet compensation targets, the OM Board continued to pay OM's executives at twice the levels of OM's peers.[7]

In its January 9, 2015 letter, FrontFour identified a specific "path to value creation . . . through (i) . . . cost-cutting opportunities of at least $50 million, (ii) the release of $30 million in working capital and (iii) a $250 million stock buyback."[8] On January 28, 2015, following the OM Board's refusal to entertain FrontFour's proposals, FrontFour announced its delivery of formal nominations of three director candidates for election to the OM Board at OM's June 1, 2015

---

[4] Compl. ¶ 36.

[5] *Id.*

[6] Though FrontFour directed its criticisms at management, they also implicated Demetriou's interests by targeting him for replacement on the OM Board as part of their proxy campaign.

[7] Indeed, the OM Board's willingness to pay relatively excessive compensation to OM's executives led to "corporate governance monitor Glass Lewis . . . consistently assign[ing] OM's compensation practices[] a grade of 'D' . . . or worse." Compl. ¶ 37.

[8] Compl. ¶ 38. By FrontFour's calculations, "successful implementation of these initiatives should result in OM Group's shares trading at approximately $60 per share, which represents upside of nearly 120%." Compl. ¶ 39 (emphasis removed) (quoting a statement made by David A. Lorber, managing member and principal owner of FrontFour).

annual stockholder meeting.[9] Analysts reacted favorably to FrontFour's proposals, raising price estimates for OM's stock to $35–$40 per share.

In response to FrontFour's January 9 letter, OM issued a press release on January 30, 2015, announcing that it was in the process of implementing most of FrontFour's proposals. Soon after, OM announced a series of additional improvements to its operations and cost structure that would result in substantial cost savings by year end 2017. On March 4, 2015, FrontFour filed a presentation with the SEC expressing concerns regarding certain aspects of OM's performance similar to those expressed in its January 9 letter including, *inter alia*, OM's value-destructive acquisition strategy, excessive executive compensation and low margins. The March 4 presentation contained a financial analysis that assumed effective implementation of FrontFour's recommendations and calculated a resulting implied share price of $55.51—more than double the company's January 8, 2015 share price.

**D. The OM Board Engages BNP Paribas to Asses Strategic Options**

As early as 2005, OM's various business lines began attracting interest from potential strategic purchasers. On August 12, 2014, a financial advisor acting on behalf of Platform contacted OM to express Platform's interest in purchasing OM's electronic chemicals business. OM refused Platform's overture and

---

[9] Due to the OM Board's classified structure, only three of the eight OM Board members stood for reelection in 2015.

indicated that it was not interested in pursuing a sale of only one segment of its business. In September and October 2014, three financial sponsors expressed to OM an interest in acquiring or investing in the company, including a written indication of interest submitted by Advent International Corporation ("Advent") to purchase all of OM's outstanding common stock at $27.00 to $32.00 per share.[10] On October 31, 2014, the OM Board held a special meeting at which management detailed its concern that "activists could derail the execution of [OM's] strategy" by calling for "change[s] in capital priorities" and an "externally driven change of board members."[11] According to Plaintiffs, these concerns prompted the OM Board to engage BNP Paribas to assess potential value creation options.[12]

During the October 31, 2014 meeting, BNP Paribas presented to the OM Board preliminary financial analyses of OM and its strategic alternatives. Included in the presentation was BNP Paribas's opinion that OM's "'[a]bility to maximize value [through a sale] may be limited due to few, if any strategic buyers for the whole company,' since OM's '[d]iverse portfolio of assets limits merger candidates,' and that a lack of operational synergies could limit the premium in any

---

[10] Plaintiffs allege that at this point in time, while FrontFour had not yet initiated a proxy contest, OM management and the OM Board were acutely aware of pressure from activist investors. Compl. ¶ 48.

[11] Compl. ¶ 48. During this September–October 2014 timeframe, FrontFour attempted to meet with OM management "and OM management cancelled at least twice." *Id.*

[12] *Id.*

transaction with a financial buyer."[13]  The OM Board authorized management to engage BNP Paribas to conduct a confidential market test and negotiated a fee structure under which BNP Paribas would be paid approximately $10 million, $7 million of which was contingent on OM consummating a merger.

**E.  The OM Board Focuses on Financial Sponsors**

On November 10, 2014, Apollo and Platform submitted a joint indication of interest to acquire all of OM's common stock at a range of $27.00 to $32.00 per share (Apollo and Platform joint bids are hereafter referred to as Apollo bids).  The following day, the OM Board met and authorized management to engage with both Advent and Apollo regarding their respective proposals, and to request that BNP Paribas contact additional potential suitors.  The OM Board indicated that the outreach efforts should remain limited to financial buyers reasonably likely to consider a transaction involving a sale of the entire company.  This outreach

---

[13] Compl. ¶ 49 (quoting BNP Paribas Oct. 31 Presentation at OMG00013, Suppl. Transmittal Aff. of Thomas P. Will in Supp. of the Director Defs. Reply Br. in Supp. of Their Mot. to Dismiss Pls. Consolidated Am. Verified Class Action Compl. Ex. A ("BNP Paribas Oct. 31 Presentation").  Defendants point out that in that same presentation BNP Paribas discussed other strategic options including doing nothing and remaining standalone, engaging in a LBO, pursuing acquisitions or realigning the Company's portfolio through divestitures which would involve the "sale of certain assets that may be more synergistic for another party."  The presentation of the divestiture approach included a discussion of sales of OM divisions to "strategic acquirors" in "multiple transactions" and noted that such a strategy carried certain identified "risks and complexities."  *Id.* at OMG00013, OMG00031.  *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) (the "incorporation-by-reference doctrine permits a court to review the actual document to ensure that the plaintiff has not misrepresented its contents and that any inference the plaintiff seeks to have drawn is a reasonable one.").

strategy was in apparent conflict with BNP Paribas's presentation suggesting that a transaction with a financial sponsor would forfeit synergistic value that might be obtained by selling OM's specific business units to strategic buyers.

Beginning in mid-November, BNP Paribas contacted five additional financial sponsors, none of which expressed interest in acquiring OM at a price competitive with Advent's or Apollo's proposals. Also in mid-November, Advent and Apollo executed confidentiality agreements after which OM released additional due diligence materials.[14] "On December 1, 2014, shortly after Apollo began its due diligence, Demetriou had a lunch meeting with Matthew Michelini, a key employee in Apollo's metals group."[15]

## F. The OM Board Engages a Second Financial Advisor

Plaintiffs allege that the OM Board desired an opinion from a second financial advisor because it recognized that BNP Paribas was conflicted.[16] To that end, the OM Board (with assistance from OM management) hired Deutsche Bank to act as the OM Board's third-party advisor independent of management. The

---

[14] Plaintiffs allege on information and belief that the confidentiality agreements "contained standstill provisions prohibiting Advent and Apollo/Platform from acquiring OM for one year or more unless OM released them from the standstill." Compl. ¶ 55.

[15] Compl. ¶ 109. The Complaint says nothing of what occurred at this meeting.

[16] Plaintiffs' only allegations regarding BNP Paribas's purported conflict are that BNP Paribas had experience working with management and therefore may favor a transaction with a private equity buyer content with retaining management, and that $7 million of BNP's $10 million compensation became payable only upon consummation of a deal. Compl. ¶¶ 57–60.

OM Board initially discussed a two-stage engagement of Deutsche Bank, consisting of a flat fee for independent advice and, if the sale process progressed, the possibility that the engagement would continue through consummation. Contrary to its initial plan, however, the OM Board ultimately engaged Deutsche Bank on a fully contingent basis, conditioning a payment of $5.32 million on the delivery of a fairness opinion and the closing of a transaction. Prior to its engagement, Deutsche Bank disclosed to OM that it had received "significant" fees from Apollo since January 1, 2013, but omitted the precise amount of those fees.[17]

By the end of December 2014, Apollo had proposed to acquire OM for between $33.00 and $35.00 per share, and Advent had submitted a non-binding proposal to acquire OM for $34.00 per share. During a meeting of the OM Board on January 15, 2015, Deutsche Bank reported that no strategic buyer had expressed interest in acquiring the entire company. It also provided its opinion that OM's implied share price for the Company as a whole was $36.80.

On January 21, 2015, OM rejected Advent's request for exclusivity causing Advent, on March 15, 2015, formally to withdraw its indication of interest. In the

---

[17] The Proxy (defined below), after disclosing that OM knew that Apollo had paid "significant fees" to Deutsche Bank at the inception of Deutsche Bank's engagement, also disclosed that the actual amount of the fees paid by Apollo to Deutsche Bank amounted to over €140 million since 2013. Deutsche Bank had also received more than €2 million from Platform over the same time period. Transmittal Aff. Of Thomas P. Will in Supp. of the Director Defs. Br. in Supp. of Their Mot. to Dismiss Pls. Consolidated Am. Verified Class Action Compl. Ex. A (OM Group, Inc. DEFM14A Proxy Statement("Proxy")) at 25, 47–48.

meantime, the OM Board's negotiations with Apollo, which had begun in 2014, continued into 2015. OM provided Apollo access to its electronic data room and additional due diligence.[18] On April 26, 2015, Apollo submitted a bid of $34.00 per share. Three days later, during a telephonic OM Board meeting, Deutsche Bank presented the OM Board with a DCF analysis valuing OM's stock at $35.27 per share.

## G. The OM Board Settles with FrontFour

As the OM Board continued to negotiate with Apollo, it also was negotiating with FrontFour in an effort to head off a proxy fight. According to the Complaint, the OM Board never revealed to FrontFour during the course of these negotiations that it was actively pursuing a sale of the Company.

On March 23, 2015, OM announced that it reached an agreement with FrontFour regarding OM Board composition (the "Settlement Agreement"). The Settlement Agreement contemplated that OM would submit two FrontFour nominees, David A. Lorber and Joseph M. Gingo, in its 2015 proxy statement for approval at the annual stockholder meeting. In addition, OM would expand the OM Board by one seat to be filled by Allen A. Spizzo, one of FrontFour's original nominees.[19]

---

[18] Compl. ¶ 55; Proxy at 26.

[19] Plaintiffs allege that OM was motivated to enter the Settlement Agreement as a means to silence FrontFour's criticism of OM's executive compensation. They also allege that

In return for OM's agreement to seat FrontFour's designees on the OM Board, FrontFour agreed to vote its shares in favor of the OM Board's nominees and to abide by standstill provisions in the Settlement Agreement that prohibited FrontFour from taking any public action regarding OM for nearly a year. The prohibited public actions included, *inter alia*, proxy solicitation activity, participation in group voting or voting trusts with respect to OM securities, encouragement of contests to the OM Board's nominations, participation in merger proposals or communications in opposition to any merger, pursuit of additional OM Board representation and any requests to amend the terms of the Settlement Agreement.[20]

## H. The OM Board Approves a Transaction with Apollo

The OM Board terminated negotiations with Apollo on two separate occasions in May 2015 when negotiations over deal terms stalled. On both occasions, Apollo capitulated and negotiations resumed.

---

silencing FrontFour contributed to Scaminace's interest in closing the Apollo transaction. Specifically, the Apollo transaction would allow Scaminace (and other executives) to continue with OM without the "oversight by new Board members who were profoundly critical of their performance and sought to . . . sharply reduce their compensation," or would at least ensure that if Apollo ultimately dismissed Scaminace following a change of control event, he "would be eligible for [a] generous golden parachute package[] . . . valued at approximately $15 million." Compl. ¶¶ 105, 107.

[20] Plaintiffs argue that the standstill provisions, in combination with OM's announcement of the transaction the same day the stockholders were to seat FrontFour's directors Compl. ¶ 81, "indicates that OM negotiated the Settlement Agreement specifically with an eye towards ensuring that the Transaction (with Apollo) could be completed without interference." Compl. ¶ 119.

On May 31, 2015, the OM Board approved Apollo's offer to acquire all outstanding OM shares for $34.00 per share cash, resulting in a total transaction value of approximately $1 billion.[21] Following the transaction, it was understood that Apollo would retain OM's magnetic technologies, battery technologies and advanced organics businesses, and would sell OM's electronic chemicals and photomasks businesses to Platform for total cash consideration of $365 million.[22]

While BNP Paribas and Deutsche Bank both provided fairness opinions endorsing the transaction, the Complaint contains several allegations that question the *bona fides* of the bankers' views. According to Plaintiffs, alone or together these concerns raise a reasonable inference that the OM Board acted unreasonably in approving the transaction.[23]

First, the $34.00 deal price fell within the lower half of BNP Paribas's suggested fair value range of $29.42 to $41.59 per share and Deutsche Bank's suggested fair value range of $31.25 to $41.75 per share.[24] In this regard, Plaintiffs

---

[21] Plaintiffs' question, in addition to the price, the timing of the transaction, citing the fact that OM's June 1, 2015 announcement of the transaction caused its stock to jump from $26.54 on May 29 to $34.04 on June 1, allowing Scaminace to exercise options with a strike price of $34.03 at a profit of approximately $480,000.

[22] Following Apollo's post-transaction spin-off, "Platform announced that the OM businesses it acquired would provide a synergy opportunity to it in excess of $20 million over two years." Compl. ¶ 81.

[23] Compl. ¶¶ 72-79.

[24] When presenting its analysis to the OM Board, one of Deutsche Bank's DCF analyses stated that the implied share price was $36.27. Compl. ¶ 72.

allege that the May 31, 2015 meeting was the first time the OM Board considered a "sum-of-the-parts" valuation, which was conducted by Deutsche Bank and resulted in a fair value range of $32.75 to $39.50 per share.[25]

Second, Plaintiffs allege that the fair value ranges provided by BNP Paribas and Deutsche Bank undervalued OM because management and the OM Board "instructed the . . . financial advisors to use revised projections that were less favorable to [OM] and contradicted statements that OM management had made to investors."[26] Specifically, in a March 6, 2015 presentation to the OM Board, management provided revised projections that reduced share price estimates by approximately $4.00 per share by lowering OM's projected EBITDA and increasing its projected working capital requirements.[27] The increase in working capital—responsible for a $3.21 per share reduction in the revised projections— was "inappropriate, given that OM management had been stressing to investors that they expected [OM's] working capital to decline."[28]

---

[25] *Id.*

[26] Compl. ¶ 73.

[27] The revised projections reduced the cumulative EBITDA projections for 2015–2019 from $796 million to $767 million, reducing OM's valuation by $2.12 per share. At the same time, the revised projections increased the cumulative working capital over the same period to $74 million from $53 million, reducing OM's valuation by $3.21 per share. The total reduction of $5.33 per share was partially offset by a decrease in capital expenditures from $238 million to $216 million, increasing the fair value per share by $1.34. Compl. ¶¶ 73–77.

[28] Compl. ¶ 78 (emphasis removed) (citing March 2 and April 30, 2015 analyst calls with OM's CFO discussing expectations regarding working capital requirements).

Third and finally, although the $34.00 per share deal price represents an approximate 28% premium to OM's unaffected stock price, it also reflects "only an 18.3% premium over the average closing price for the 30 trading days prior to the transaction . . ., [and is] an approximate 10% discount to OM's 2014 high, an approximate 17% discount to OM's five-year high, and a greater than 50% discount to OM's all-time high."[29]  According to Plaintiffs, OM's Management could have increased OM's market capitalization merely by signaling an end to its acquisition binge.  Instead, by plowing forward into the transaction, OM prompted certain sophisticated investors, including a *Seeking Alpha* analyst, Cove Street Capital and an APB Financial Group analyst, to criticize the transaction and to perform their own sum-of-the-parts analyses which revealed a fair value per OM share ranging from "the low $40s" to $49 per share.[30]

In addition to the value left on the table by the OM Board, Plaintiffs point to several non-monetary flaws in the transaction they allege reflect the OM Board's rush to lock up and close the first deal that would allow them to avoid the embarrassment of a battle with FrontFour.  Sections 1.6 and 7.5 of the Merger Agreement provided for the OM Board's mandatory resignation immediately before the closing date, forcing out the FrontFour nominees almost immediately

---

[29] Compl. ¶ 84.

[30] Compl. ¶ 90.

17

after they were elected and ensuring that any improvements implemented during their short tenure would inure to the exclusive benefit of Apollo and Platform.[31] The Settlement Agreement assured that any opposition to the transaction FrontFour might have expressed was silenced.

Section 6.2 of the Merger Agreement provided for a "go-shop" period of just over one month, but allowed Apollo and Platform to scrutinize the entire process. The go-shop lasted from May 31, 2015 through July 5, 2015 (the "Go-Shop Period"). During this time, upon providing non-public information requested by any potential acquirer, OM was required to "substantially concurrently" provide to Apollo and Platform that same information unless it was previously disclosed. Section 6.2 also required OM to keep Apollo and Platform "informed on a reasonably current basis (and in any event within forty-eight hours) of the status and terms and conditions of any [competing proposal], including the price and form of consideration and all material terms and conditions (other than the identity of the party thereto) . . . and any material developments, discussions or negotiations in connection therewith."[32] If informed of a superior proposal, Section 6.2 granted Apollo and Platform corresponding "matching rights."

---

[31] Sections 1.6 and 7.5 of the Merger Agreement further provide that the directors of the merger subsidiary are to replace the OM Board upon its mandatory resignation.

[32] Proxy at Annex A (Agreement and Plan of Merger ("Merger Agmt.")) § 6.2(a).

18

While the Merger Agreement countenanced post-go-shop negotiations with Excluded Parties,[33] it prohibited OM from soliciting third parties after 12:00 a.m. eastern time on July 5, 2015. After that time, the OM Board could negotiate with third parties only if the third party submitted an unsolicited proposal the OM Board could reasonably expect to lead to a Company Superior Proposal.[34] Notably, Section 6.2(f) of the Merger Agreement prohibited OM from altering its recommendation to the stockholders in favor of the Apollo transaction unless the OM Board determined in good faith that the third-party proposal could reasonably qualify as a Company Superior Proposal. This prohibition effectively barred the OM Board from recommending any transaction for less than 90% of OM's assets.

Finally, Sections 9.1(c) and 9.2(b) of the Merger Agreement contemplated a termination fee of $18.3 million (approximately 1.83% of the transaction price) if the agreement terminated prior to expiration of the Go-Shop Period or at any time in favor of an agreement with an Excluded Party. If terminated in any other circumstance, the Merger Agreement's termination fee would jump to $36,575,000 (approximately 3.66% of the transaction price).

---

[33] The Merger Agreement defines "Excluded Party" as any party from whom OM Group has received, prior to termination of the Go-Shop Period, a Company Superior Proposal or an offer that "could reasonably be expected to lead to a Company Superior Proposal." *Id.* § 11.2.

[34] The Merger Agreement defines "Company Superior Proposal" as a "written, [bona fide inquiry, proposal or offer] . . . that if consummated would result in a third party . . . acquiring, directly or indirectly, (1) more than 50% of [OM's] Common Stock or (2) [more than 90 % of OM's] assets or businesses." *Id.*

## I.  The Post-Signing Go-Shop

During the Go-Shop Period, BNP Paribas and Deutsche Bank contacted forty-nine parties, including twenty-one strategic buyers, marking the first solicitation to potential strategic acquirers during the sale process.  Only five parties responded, three of which entered into confidentiality agreements with OM and received due diligence materials.  On July 5, 2015, the first day following the expiration of the Go-Shop Period, OM received a letter dated July 4, 2015 from Advanced Technology & Materials Co., Ltd. ("Advanced") indicating its interest to acquire OM, jointly with one or more co-investors, for between $35.00 and $36.00 per share.

The OM Board determined that Advanced was an Excluded Party.  Accordingly, the OM Board could continue to negotiate with Advanced beyond the Go-Shop Period.  But Advanced had a problem.  It was a foreign company that was banned by federal law from acquiring certain OM assets that sold high-tech equipment to the U.S. military.  Advanced asked OM to postpone the stockholder vote on the Apollo merger to allow it more time to work around the problem.  The OM Board declined.  According to Plaintiffs, this effectively took Advanced out the running.  On August 4, 2015, OM reported that Advanced would not submit a Company Superior Proposal and reaffirmed its recommendation that OM's stockholders approve the Merger Agreement.

## J. The Closing

On July 10, 2015, OM filed its Form DEFM14A Proxy Statement (the "Proxy") noticing an August 10, 2015 special stockholder meeting to approve the Merger Agreement and recommending that stockholders vote their shares in favor of the transaction. At the August 10 special meeting, the stockholders approved, by a margin of 10:1, the Merger Agreement and a precatory executive compensation scheme in line with the merger. The Merger Agreement closed on October 28, 2015. Also on October 28, Scaminace announced his decision to step down as CEO thereby triggering $15 million in golden parachute payments.

## K. The Procedural History

Six complaints challenging the transaction were filed in this Court within weeks of OM's announcement of the deal. The Court consolidated the complaints and granted a motion to expedite in aid of a motion to enjoin the transaction. After conducting expedited discovery, Plaintiffs withdrew their motion for a preliminary injunction and amended their complaint to seek post-closing remedies. Defendants then moved to dismiss the amended Complaint.

## II. ANALYSIS

### A. Motion to Dismiss Standard

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[35] Under this standard, the Court will deny the motion if the plaintiff has pled a reasonably conceivable cause of action.[36] All well-pled allegations in the complaint will be regarded as true, but the Court need not accept conclusory allegations that lack any factual basis.[37]

### B. Standard of Review

When faced with a stockholder challenge to a board of directors' exercise of fiduciary duties in the course of negotiating and approving a corporate transaction, the prime determination for the Court is the applicable standard of review. "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[38] This Court generally applies the entire fairness standard "when the board labors under actual conflicts of interest."[39] While Plaintiffs allege that each member of the OM Board

---

[35] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[36] *Id.*

[37] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011); *Criden v. Steinberg*, 2000 WL 354390, at *1 (Del. Ch. Mar. 23, 2000).

[38] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

[39] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013); *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 747 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

acted out of an overpowering sense of self-interest (indeed, reputational self-preservation), they do not advocate for entire fairness review.[40] This likely reflects their appreciation that the Complaint alleges no facts from which one could infer that a majority of the OM Board was interested in the transaction or that the OM Board labored under the influence of a controller.

Accordingly, the question here is whether the transaction is subject to the business judgment rule or enhanced scrutiny under *Revlon*. The OM stockholders were cashed-out in the merger. At first glance, therefore, it would appear that *Revlon* governs and that the Court should review the sales process to determine whether the OM Directors acted reasonably to pursue the transaction that offered the best value reasonably available to the OM stockholders.[41]

Before the Court launches into its *Revlon* analysis, however, it must first account for the fact that another "qualified decision maker," the disinterested OM

---

[40] Tr. of Oral Arg. on Defs. Mot. to Dismiss ("Oral Arg. Tr.") 74 ("Your Honor, you're correct in that I am not arguing entire fairness.").

[41] *TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at *7 (Del. Ch. March 2, 1989) (Allen, C.) ("In the settling of a sale of a company for cash, the board's duty to shareholders is inconsistent with acts not designed to maximize present share value, acts which in other circumstances might be accounted for or justified by reference to the long run interests of shareholders."); *In re Rural Metro Corp.*, 88 A.3d 54, 82–83 (Del. Ch. 2014) ("Enhanced scrutiny applies in [the context of a sale of a corporation for cash] because of the potential conflicts of interest that fiduciaries face when considering whether to sell the corporation, to whom, and on what terms.").

stockholders, overwhelmingly approved the transaction.[42]  If their approval was the product of a fully informed, uncoerced vote, then, under *Corwin v. KKR Financial Holdings, LLC*,[43] the irrebuttable business judgment rule would apply and the OM Board's decision to approve the Merger would be "insulate[d] … from all attacks other than on grounds of waste."[44]  Since the effect of the stockholder vote will dictate the standard of review by which the OM Board's conduct will be measured, it is appropriate to address this potentially case dispositive issue first.[45]

## C. The OM Stockholders' Vote Was Fully Informed

In the wake of disinterested stockholder approval of a merger not subject to the entire fairness standard, a plaintiff seeking to hold directors individually liable

---

[42] *See* J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wm. Mitchell L. Rev. 1443, 1444 (2014) ("To the extent the board is compromised by the situational pressures that trigger enhanced scrutiny, the collective body of disinterested and informed stockholders should be able to act as a qualified decision maker to which the court should defer.").

[43] 125 A.3d 304 (Del. 2015).

[44] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 1001 (Del. Ch. 2014), *aff'd*, *Corwin v. KKR Fin. Hldgs. LLC,* 125 A.3d 304, 312-14 (Del. 2015).  *See also Volcano Corp. S'holder Litig.*, 2016 WL 3626521, at *9 (Del. Ch. June 30, 2016) ("[R]ecent Supreme Court decisions confirm that the approval of a merger by a majority of a corporation's outstanding shares pursuant to a statutorily required vote of the corporation's fully informed, uncoerced, disinterested stockholders renders the business judgment rule irrebuttable.").

[45] *Corwin*, 125 A.3d at 308 ("[W]e need not delve into whether the Court of Chancery's determination that *Revlon* did not apply to the merger is correct for a single reason: it does not matter. Because the Chancellor was correct in determining that the entire fairness standard did not apply to the merger, the Chancellor's analysis of the effect of the uncoerced, informed stockholder vote is outcome-determinative, even if *Revlon* applied to the merger.").

for approving the merger must take either or both of two paths to overcome a motion to dismiss: (1) demonstrate that the transaction amounted to corporate waste; or (2) demonstrate that the stockholder vote was uninformed or coerced.[46] The path of least resistance is to challenge the soundness of the stockholder vote.[47] Indeed, "the [*Corwin*] doctrine applies only to fully informed, uncoerced stockholder votes, and if troubling facts regarding director behavior were not disclosed that would have been material to a voting stockholder, then the business judgment rule is not invoked."[48]

Plaintiffs have not attempted to plead a claim for waste but instead seek to avoid *Corwin* burden-reduction by arguing that the OM Board either failed to disclose material information or made materially misleading partial disclosures to the OM stockholders regarding the merger thereby rendering the vote uninformed. It is well-settled that directors of Delaware corporations owe to the stockholders "a fiduciary duty to disclose fully and fairly all material information within the

---

[46] *Id.* at 312–14.

[47] *Singh v. Attenborough*, 137 A.3d 151, 152 (Del. 2016) (ORDER) (noting that dismissal "is typically the result" in cases where a plaintiff has challenged a transaction on grounds of waste, a concept that has "little 'real-world relevance'" in M&A transactions "because stockholders would be unlikely to approve a transaction that is wasteful."). *See also In re Zale Corp. S'holders Litig.*, 2015 WL 6551418, at *2 (Del. Ch. Oct. 29, 2015); *City of Miami General Employers' and Sanitation Employees' Retirement Trust v. Comstock, et al.*, 2016 WL 4464156, at *17 (Del. Ch. August 24, 2016) ("[I]n such cases, dismissal is typically the result because the transaction then can be attacked only on grounds of waste. . .").

[48] *Corwin*, 125 A.3d at 312.

board's control when it seeks shareholder action."[49] "The duty of directors to observe proper disclosure requirements derives from the combination of the fiduciary duties of care, loyalty and good faith."[50] A fact is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[51] Stated differently, material facts are those that, if disclosed, would "significantly alter the 'total mix' of information."[52]

To establish the materiality of an omitted fact, a plaintiff "must show a substantial likelihood that the omitted facts would have assumed actual significance in the deliberations of a reasonable stockholder. . . ."[53] While the determination of materiality is a case specific endeavor,[54] our courts have recognized that a board's disclosure obligation is "not boundless"[55] and that the board need not disclose information simply because it "might be helpful."[56] Thus, a board need not disclose "[c]onsistent and redundant facts" or "insignificant

---

[49] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[50] *Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998).

[51] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[52] *Abrons v. Maree*, 911 A.2d 805, 813 (Del. Ch. 2006).

[53] *McMillan v. Intercargo Corp.*, 1999 WL 288128, at *5 (Del. Ch. May 3, 1999).

[54] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997).

[55] *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007).

[56] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).

details and reasonable assumptions" and must remain mindful of "the fallacy that increasingly detailed disclosure is always material and beneficial disclosure."[57]

Here, 89.6% of the shares voted at the stockholder meeting approved the transaction, representing 75.7% of OM's total outstanding common shares. Nevertheless, Plaintiffs urge the Court to ignore the stockholder vote because the Proxy was misleading in three material respects: (1) it omitted information regarding Advanced's competing bid through misleading partial disclosures; (2) it omitted information about Demetriou's alleged conflicts of interest; and (3) it omitted information about the evolution of Deutsche Bank's engagement and the timing of the OM Board's discovery of the extent of Deutsche Bank's conflicts.[58]

---

[57] *Zirn v. VLI Corp.*, 1995 WL 362616, at *4 (Del. Ch. June 12, 1995), *aff'd*, 681 A.2d 1050 (Del. 1996)). *See also In re Answers Corp. S'holders Litig.*, 2011 WL 1366780, at *5 (Del. Ch. Apr. 11, 2011) (noting that public disclosures need not "inundate" stockholders "with an overload of information").

[58] Curiously, the Complaint does not allege that the OM Board failed to disclose facts that would allow stockholders to appreciate the factual bases of the gravamen of Plaintiffs' breach of fiduciary duty claim, including the financial advisors' views that separate sales of OM's divisions would yield more value for stockholders than a sale of OM in the aggregate, the rushed timing of the transaction to a avoid confrontation with a shareholder activist, or the flaws in the management projections used by the OM Board to value OM. The *Corwin* doctrine does not apply if "troubling facts regarding director behavior were not disclosed that would have been material to a voting stockholder. . . ." *Corwin*, 125 A.3d at 312. And while a board need not engage in "self-flagellation," *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997), it is telling that Plaintiffs have not suggested that the OM stockholders were not told of material facts relating to FrontFour, including the FrontFour settlement, the advice received by the OM Board from financial advisors regarding the value of sum-of-the-parts transactions, management projections or the details of the alleged banker conflicts (as opposed to the timing of the OM Board's discovery of the conflicts).

27

Whether the Company's disclosures are adequate is a mixed question of law and fact.[59] In this case, I am satisfied that no further development of the factual record would be useful in determining the materiality of the alleged disclosure deficiencies. Whatever discovery that might be useful in evaluating the disclosures has been taken by Plaintiffs in aid of their later-abandoned motion for preliminary injunction and the fruits of that effort have been incorporated within the Complaint. Moreover, Plaintiffs have not identified any areas of factual dispute with respect to their disclosure claims and I can discern none. The identified omissions or misleading partial disclosures are either legally material or they are not. I will address them in turn.[60]

### 1. Advanced's Competing Bid

Plaintiffs argue that the Proxy's failure to disclose (i) that Advanced "made a written proposal in the $35.00 to $36.00 per share range during the Go-Shop [Period] . . .; and (ii) that Advanced . . . requested additional time to work out certain issues in order to submit a [Company] Superior Proposal but the Board

---

[59] *Zirn v. VLI Corp.*, 681 A.2d 1050, 1055 (Del. 1996).

[60] Even though Plaintiffs elected not to press their "disclosure claims" pre-closing in connection with their ultimately-abandoned motion for preliminary injunction, *see In re Transkaryotic Ther., Inc.* 954 A.2d 346, 360-62 (Del. Ch. 2008) (expressing a preference to address disclosure claims prior to the stockholder vote), it is appropriate to address them on the merits in this procedural context since Defendants have invoked the *Corwin* doctrine and thereby have called the question of whether the stockholder vote approving the merger was uncoerced and fully informed. *See City of Miami Gen. Empls. & San. Empls. Ret. Trust v. Comstock*, 2016 WL 4464156, at *9 (Del. Ch. Aug. 24, 2016).

refused to consider the request" are both material omissions that render the Proxy materially misleading.[61] According to Plaintiffs, the omissions are particularly misleading in light of the Proxy's partial disclosures that (i) an Excluded Party emerged during the Go-Shop Period; (ii) the OM Board negotiated with the Excluded Party; and (iii) the Excluded Party ultimately did not submit a Company Superior Proposal. In Plaintiffs' view, these "partial and incomplete disclosures" misleadingly suggested to OM's stockholders that Advanced's bid was below Apollo's and that Advanced walked away from negotiations when, in fact, the OM Board refused to consider Advanced's request for a time extension.[62]

Plaintiffs point to *Arnold v. Soc'y for Sav. Bancorp, Inc.*,[63] where our Supreme Court recognized that a partial and incomplete disclosure of arguably immaterial information regarding the history of negotiations leading to a merger might result in a materially misleading disclosure if not supplemented with information that would allow the stockholders to draw the complete picture.[64] Against the *Arnold* backdrop, although not conceding the point, Plaintiffs are willing to spot the Defendants their argument that the negotiations with Advanced

---

[61] Pls. Opp'n to the Director Defs. Mot. to Dismiss ("Pls. Answering Br.") 46.

[62] *Id.* at 47–48. Oral Arg. Tr. 80 ("The disclosures that we just read give the distinct impression . . . that Advance[d] just walked away, that they weren't interested. And that's demonstrably not true. They were interested. They wanted to continue working, and the board said no.").

[63] 650 A.2d 1270 (Del. 1994).

[64] *Id.* at 1281.

were so tentative and the likelihood of a deal with Advanced was so speculative that any facts relating to an Advanced proposal would be deemed immaterial as a matter of Delaware law.[65] Even so, Plaintiffs argue that once the Proxy "traveled down the road of partial disclosure of the history" of discussions with Advanced, the OM Board was obliged to "provide the stockholders with an accurate, full, and fair characterization of those historic events."[66]

While Plaintiffs' statement on Delaware law regarding partial disclosures is correct as a general matter, it does not quite complete the circle. "The partial disclosure rule is implicated only where the omission of a related fact renders the partially disclosed information *materially* misleading."[67] Even in the partial disclosure context, our Supreme Court's guidance on materiality is still the benchmark. And given the Proxy's discussion of the Advanced overture, with references to defined terms within the Merger Agreement that place the potential proposal in context, I cannot reasonably infer that the absence of the information

---

[65] This Court generally will deem as immaterial for disclosure purposes a board's decision to shut down negotiations with a potential acquirer that have not produced an offer worth pursuing. *Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at \*12 (Del. Ch. June 27, 2008) ("In the usual case, where a board has not received a firm offer or has declined to continue negotiations with a potential acquirer because it has not received an offer worth pursuing, disclosure is not required."). Indeed, "requiring disclosure of every material event that occurred *and* every decision not to pursue another option would make proxy statements so voluminous that they would be practically useless." *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 736 (Del. Ch. 1999), *aff'd sub nom.*, *Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000).

[66] *Arnold*, 650 A.2d at 1280.

[67] *Zirn*, 681 A.2d at 1057 (emphasis in original).

Plaintiffs have identified as omitted facts from the Proxy rendered the Proxy materially misleading.

In a section titled "Subsequent Events", which appears after the history of the merger negotiations, the Proxy discloses that "[p]rior to the expiration of the Go-Shop Period, the Board received a written company takeover proposal."[68] Based on this information, the stockholders were aware that a party had come forward during the Go-Shop Period with a proposal that potentially competed with the Apollo offer. The Proxy continues: "[a]fter consulting with its financial advisors and legal counsel, the Board determined that the party submitting the proposal is an excluded party under the Merger Agreement with which the Company may continue to negotiate following the end of the Go-Shop Period until such party ceases to be an excluded party as defined under the Merger Agreement."[69] The term "Excluded Party" is defined in the Merger Agreement as:

> any Person, or group of Persons from whom the Company or any of its Representatives has received, prior to the No-Shop Period Start Date, a Company Takeover Proposal that the Company Board or duly constituted or authorized committee thereof determines, in good faith, prior to or as of the No-Shop Period Start Date and after consultation with its financial advisors and legal counsel, constitutes or could reasonably be expected to lead to a Company Superior Proposal.[70]

---

[68] Proxy at 32.

[69] *Id.*

[70] Merger Agmt. §11.2. The Proxy entreats stockholders more than once to "read the entire Merger Agreement carefully." *See, e.g.*, Proxy at 5, 23, 75.

With this information, stockholders knew that, with the help of financial and legal experts, the Board had determined that Advanced was an Excluded Party, meaning that the Board had, in good faith, determined that Advanced's proposal either constituted or could reasonably be expected to lead to a Company Superior Proposal. The term "Company Superior Proposal" is defined in the Merger Agreement as:

> a bona fide, written Company Takeover Proposal . . . (i) that if consummated would result in a third party . . . acquiring, directly or indirectly, (1) more than 50% of the Company Common Stock or (2) assets or businesses of the Company and its Subsidiaries representing more than 90% of the consolidated assets, revenues or net income of the Company and its Subsidiaries . . . that is reasonably capable of being completed as proposed on a timely basis, after taking into account (A) all financial, legal, regulatory and other aspects of such Company Takeover Proposal . . . and (B) the identity of the Person making such Company Takeover Proposal, and (ii) that the Company Board determines in good faith, after consultation with legal counsel and its financial advisor . . . is more favorable to the stockholders of the Company than the Merger.[71]

Based on this information, the stockholders knew that the Excluded Party had submitted a proposal that either was or could lead to a bona fide offer for at least 50% of the common stock or 90% of the Company's assets and that the Board, in good faith, thought the proposal could be more favorable to stockholders than the Apollo offer. The Proxy made clear, however, that

> [t]here can be no assurance that the proposal or any other alternative proposal will ultimately lead to a superior proposal, as negotiations

---

[71] Merger Agmt. § 11.2

with the excluded party may not result in a superior proposal and could terminate at any time. The Company does not intend to make any public announcement regarding the negotiations with the excluded party unless such party ceases to be an excluded party or the Board makes a change of recommendation.[72]

The company later announced that the bidder would not be making a superior proposal. This, in turn, allowed stockholders to conclude that for either "financial, legal, or regulatory" reasons, the Board, in good faith, had determined that the offer would not be more favorable to stockholders than the current merger proposal or that it was not "reasonably capable of being completed on a timely basis." Indeed, given that Advanced, a Chinese company, faced unresolved and potentially unresolvable regulatory obstacles to an acquisition of certain of OM's assets that were connected to the United States military, the disclosure that Advanced could not make a "Company Superior Proposal" reflected accurately the OM Board's assessment that Advanced was not able to make a proposal on a "timely basis" that was "reasonably capable of being completed" from a "regulatory" perspective. There was no material omission and no materially misleading partial disclosure.[73]

---

[72] Proxy at 32.

[73] *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *12 (Del. Ch. Nov. 30, 2007) ("[A] reasonable line has to be drawn or else disclosures in proxy solicitations will become so detailed and voluminous that they will no longer serve their purpose." (alteration in original) (internal quotation marks omitted)); *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *15 (Del. Ch. June 30, 2014) ("Delaware law does not require management 'to discuss the panoply of possible alternatives to the course of

Plaintiffs also suggest that the OM Board made the wrong call when it determined that the Advanced overture was not worth pursuing after designating Advanced an "Excluded Party" during the Go-Shop Period.[74] A similar argument was raised and rejected in *City of Miami General Employers' and Sanitation Employees' Retirement Trust v. Comstock*.[75] There, Chancellor Bouchard concluded that the plaintiff's disclosure claim boiled down to an argument that plaintiff disagreed with a Special Committee's decision not to pursue another acquisition proposal and that other "stockholders should have been informed about the offer in case they, too, disagreed with the Special Committee."[76] The Chancellor noted that the Board was "not obliged to [make such a disclosure] under Delaware law, which does not require disclosing details about other offers

---

action it is proposing,' in part because 'stockholders have a veto power over fundamental corporate changes (such as a merger) but entrust management with evaluating the alternatives and deciding which fundamental changes to propose.'") (internal quotation marks omitted).

[74] Oral Arg. Tr. 82–83 ("[T]he mere fact of telling stockholders that this other potential superior bid is out there, 'I said no to extend the time because I thought I wasn't allowed to,' might cause them to vote down the deal and allow that extra time. That's within the discretion of the shareholders. For them to say, 'Well, I'm not going to tell you because you might get confused and vote against this transaction,' that's precisely why they should have explained it to them and let the shareholders make an informed vote.").

[75] 2016 WL 4464156 (Del. Ch. Aug. 24, 2016).

[76] *Id.* at *15.

that directors conclude are not worth pursuing."[77]  The same is true for the OM Board.[78]

## 2. Demetriou's Conflicts of Interest

Plaintiffs next allege that the Proxy's failure to inform OM stockholders that "(i) Demetriou was Chairman and CEO of a company partially owned by Apollo; and (ii) . . . Demetriou met with Apollo during the sales process" constitute material omissions.  To be sure, stockholders of Delaware corporations are "entitled to know that certain of their fiduciaries [have] a self-interest that [is] arguably in conflict with their own, and the omission of [that] fact [is] material."[79]

As in all matters of public disclosure, materiality is the touchstone of the board's disclosure duty.  This is true with respect to the disclosure of director conflicts.[80]  And not every fact tending remotely to suggest that a board member's interest might differ in some respect from that of the stockholders amounts to a material omission.[81]  Plaintiffs must allege facts from which the Court may

---

[77] *Id.*

[78] *Simonetti Rollover IRA*, 2008 WL 5048692, at *12.

[79] *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1061 (Del. Ch. 1987).

[80] *See Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 122-23 (Del. Ch. 1986) (dismissing disclosure claims regarding director conflicts on summary judgment because alleged omissions not material as a matter of law).

[81] *Id.*

reasonably infer that "there is a substantial likelihood that a reasonable shareholder would consider [the omission] important in deciding how to vote."[82]

The Complaint alleges no facts from which I can reasonably infer that the omitted facts relating to Demetrious' connection to Apollo reflect an actual conflict or are otherwise material. The Complaint alleges: (1) Demetriou was the CEO of Aleris; (2) Apollo (through its affiliates) owns 18.99% of Aleris as part of an investment group; and (3) on December 1, 2014, Demetriou had lunch with "Matthew Michelini, a key employee in Apollo's metals group."[83] Other than conclusory assertions of conflict, however, the Complaint pleads no facts that would allow a reasonable inference that a single lunch meeting between an Apollo employee and an executive of a company in which Apollo and its affiliates have an ownership stake would somehow compromise Demetriou's independence or otherwise be material to a reasonable investor.[84]

---

[82] *Rosenblatt*, 493 A.2d at 944 (quoting *TSC Indus., Inc.*, 426 U.S. at 449).

[83] Compl. ¶ 109.

[84] *See In re CompuCom Sys., Inc. S'holders Litig.*, 2005 WL 2481325, at *9 (Del. Ch. Sept. 29, 2005) (conclusory allegations of director conflict not sufficient). Plaintiffs do not cite a single case, and I am aware of none, in which a remote potential conflict of a single fiduciary was deemed *per se* material. In all of the cases cited by the Plaintiffs for the proposition that stockholders have the right to full disclosure of potential conflicts, the undisclosed potential conflict occurred in factual scenarios in which the directors had either an undisclosed financial interest directly adverse to stockholders or in which there were reasons to believe that a director with an undisclosed conflict had actual or potential influence over other members of the Board. Pls. Answering Br. 49–50. *See, Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051 (Del. Ch. 1987) (holding that an Offer to Purchase used for a self-tender offer contained material omissions because, among other

Notably, Plaintiffs do not allege that Apollo controlled or even influenced Demetriou or that Demetriou controlled or had undue influence over any other members of the OM Board. Plaintiffs' conclusory allegation that "Demetriou was influenced to support the Transaction" due to his "pre-existing relationship with OM's counterparty Apollo"[85] does not make it reasonably conceivable that this information should have been inserted in the Proxy or, if it was included, that it would have changed the total mix of information available to investors or would be important to a reasonable investor in deciding how to vote her shares. Thus, even if Plaintiffs' conclusory allegations regarding Demetriou's conflict were deemed factual and true, without even the slightest indication much less allegation that Demetriou could exercise undue influence over the other indisputably independent

---

deficiencies, it failed to disclose that half of the directors, as holders of significant amounts of common stock, had a direct financial conflict of interest with preferred stockholders); *In re Lear Corp. S'holder Litig.*, 926 A.2d 94 (Del. Ch. 2007) (holding that a proxy statement contained material omissions because it failed to disclose a CEO, the negotiator singularly employed by the board to obtain the best price for the stockholders, had an acute liquidity need which could rationally lead him to favor a deal at a less than optimal price); *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11 (Del. Ch. 2002) (holding that it is material for stockholders to know the interconnected relationships of independent and insider directors when the insider director has *de jure* and *de facto* control over the independent directors at another entity); *In re Orchard Enterprises, Inc. S'holder Litig.*, 88 A.3d 1 (Del. Ch. 2014) (holding that genuine issue of material fact as to whether proxy statement's disclosures about negotiating committee chairman's relationship with controlling stockholder were inaccurate or misleading precluded summary judgment).

[85] Compl. ¶ 109.

members of the OM Board, I cannot accept Plaintiffs' contention that the omission of facts relating to the Demetriou "conflict" was material.[86]

### 3. Deutsche Bank Conflicts

Plaintiffs' final argument to challenge the cleansing effect of the stockholder vote is that the stockholders were uninformed regarding material aspects of the OM Board's engagement of Deutsche Bank. Specifically, they allege that the Proxy misled OM stockholders in two material respects: (1) the Proxy failed to disclose that the OM Board did not discover the precise amount fees paid by Apollo to Deutsche Bank until the day the OM Board approved the merger; and (2) the Proxy failed to disclose that the OM Board initially contemplated hiring Deutsche Bank on a flat fee basis but then inexplicably converted the engagement to a contingency fee arrangement.

"Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, this Court has required full disclosure of investment banker compensation and potential conflicts."[87] It is important that stockholders "understand what factors might

---

[86] I note that Plaintiffs deposed Demetriou in aid of their motion for preliminary injunction and cited frequently to his deposition transcript throughout their Complaint. If there was a factual basis to allege that Demetriou controlled other members of the OM Board, Plaintiffs certainly would have pled those facts.

[87] *Del Monte*, 25 A.3d at 832.

influence the financial advisor's analytical efforts."[88]  Here, the Proxy thoroughly and accurately disclosed the terms under which Deutsche Bank was engaged by the Board to provide investment banking advice and the extent to which Deutsche Bank had previously provided services to Apollo and Platform.

With respect to the terms and circumstances of Deutsche Bank's engagement, the Proxy disclosed that Deutsche Bank would be paid $1.5 million upon delivery of a fairness opinion and that payment of the balance of the fee was contingent upon consummation of the merger.[89]  The Proxy also disclosed that "more than €140 million in fees [had been paid to Deutsche Bank] from Apollo" since January 1, 2013.[90]  In this regard, stockholders were advised that the OM Board knew upon Deutsche Bank's engagement that it "had an ongoing relationship with Apollo and its affiliated funds and had received *significant fees*

---

[88] *David P. Simonetti Rollover IRA*, 2008 WL 5048692, at *8.

[89] Specifically, the Proxy states that

> [p]ursuant to an engagement letter between OM Group and Deutsche Bank, dated February 4, 2015, OM Group has agreed to pay Deutsche Bank a fee estimated to be approximately $5.32 million for its services as financial advisor to the non-executive members of the Board in connection with the merger, of which $1,500,000 became payable upon delivery of its opinion (or would have become payable if Deutsche Bank had advised the Board that it was unable to render its opinion) and the remainder of which is contingent upon consummation of the merger.

Proxy at 47.

[90] *Id.* at 47–48.

from Apollo and its affiliates for a variety of investment and commercial banking services over the prior three years."[91]

With these disclosures in hand, OM stockholders knew precisely the amount and circumstances under which Deutsche Bank would be paid for its services. And they knew that the OM Board was aware that Deutsche Bank had received "significant fees" from Apollo at the time the OM Board agreed to the engagement. It is not reasonably conceivable that stockholders would have found the timing of the OM Board's discovery that "significant fees" means "€140 million" to be important in deciding whether to vote to approve the merger.[92]

Plaintiffs' argument that the Proxy materially omitted that the OM Board altered the compensation arrangement with Deutsche Bank from fixed fee to contingency fee fares no better. While Plaintiffs have correctly recited that our law "require[s] full disclosure of investment banker compensation and potential conflicts"[93] so that "stockholders [can] understand what factors might influence the

---

[91] *Id.* at 25 (emphasis added).

[92] Such a disclosure would add little, if anything, to the total mix of information available to stockholders and, at best, might tend to expose the OM Board to a potential claim for breach of the duty of care. Yet it is well settled that "a board is not required to engage in 'self-flagellation' and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter." *Stroud*, 606 A.2d 75, 84 n.1 (Del. 1992).

[93] *Del Monte*, 25 A.3d at 832.

financial advisor's analytical efforts,"[94] they have failed to articulate in what manner the Proxy materially missed this mark. The OM stockholders were fully apprised of Deutsche Bank's past work with Apollo and of the contingent nature of its engagement by the OM Board. They were not misled as to Deutsche Bank's incentives. To the extent Plaintiffs are arguing that the evolution of the OM Board's thinking regarding the terms by which Deutsche Bank would be engaged should have been disclosed, this is precisely the sort of "'play-by-play' information that this Court repeatedly has eschewed requiring companies to disclose."[95]

Plaintiffs have not well-pled facts that allow me to conclude it is reasonably conceivable that any of the omissions regarding Deutsche Bank would have significantly altered the total mix of information available to OM's stockholders or that a reasonable investor would have considered this information important in deciding how to vote on the proposed merger.[96] Consequently, Plaintiffs' allegations regarding Deutsche Bank fail to state a disclosure claim and fail to undermine the cleansing effect of stockholder approval.

---

[94] *David P. Simonetti Rollover IRA*, 2008 WL 5048692, at *8.

[95] *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *15 (Del. Ch. June 30, 2014). *See also In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1130 (Del. Ch. 2011) (holding that the board's "underlying reasons for acting" generally not deemed material); *Newman v. Warren*, 684 A.2d 1239, 1246 (Del. Ch. 1996) ("asking why a fiduciary took a certain action does not state a meritorious disclosure claim.").

[96] *Abrons*, 911 A.2d at 813.

**D. The Business Judgment Rule Applies**

Having determined that a majority of the disinterested, uncoerced and fully informed OM stockholders approved the merger, it follows that the standard of review will shift from enhanced scrutiny to the business judgment rule.[97] And, '[w]hen the business judgment rule standard of review is invoked because of a vote, dismissal typically is the result."[98] As Plaintiffs have not alleged or argued that the merger amounted to waste, they cannot overcome the presumption of the business judgment rule.[99]

## III. CONCLUSION

The OM stockholders' fully informed, disinterested and uncoerced approval of the Merger Agreement cleansed any failure of the OM Board to act reasonably to seek the transaction offering the best value reasonably available. Consequently, the motion to dismiss the Complaint must be GRANTED.

**IT IS SO ORDERED.**

---

[97] *Corwin,* 125 A.3d at 308–312; *Volcano*, 2016 WL 3626521, at *11 (a transaction approved by a fully informed vote of the majority of a company's disinterested, uncoerced stockholders irrebuttably invokes the business judgment rule and "can [only] be challenged on the basis that it constituted waste.").

[98] *Singh v. Attenborough*, 137 A.3d 151, 152 (Del. 2016) (ORDER).

[99] *Id.*